When you're ready, Counsel. Good morning, Your Honors. Bert Vega for the Petitioner. May it please the Court. It's a privilege to be with you, Your Honor. My case is about a political asylum case from the Philippines. It's a husband and wife case. We have Mr. Evangelistas, the lead petitioner in this case. This case revolves around two things. It started with a mayor having to ask the couple to finance gambling operations in the Philippines. And then the fading out with the mayor when he learned about the illegal activities of the mayor, pocketing the money from the proceeds of these gambling operations. And then the protection being offered by the rebels, the NPA, which we all know to be a new people's army, a communist movement, guerrilla in the Philippines, that is waging war until now against the democratic government of the Philippines. They offered protection for this couple against the mayor who allegedly are threatening them because of their, voicing out their opinion against the mayor and pocketing the proceeds of this gambling operation. He, the couple refused the protection from the NPA. They were both tortured by the mayor and by the rebels. Now, I saw the testimony of Mr. Evangelista that he was tortured three times. I got no testimony that his wife was tortured. Did I miss something in the transcript? Your Honor, the, it's basically, it's basically the testimony of Mr. Evangelista in this case, Your Honor. Yes, but I understand the only point on which Mrs. Evangelista testified was really going to voluntary departure. But I did not see in Mr. Evangelista's testimony any statement that his wife had been tortured. No, Your Honor. Now, did I misread the testimony? No, Your Honor. Okay. It is the, I'm sorry. That's all right. But the IG in this case ruled basically saying that there were inconsistencies with the testimony of the lead respondent in that case, or the petitioner now. That's what he was. The immigration judge denied the application. The first inconsistency were the dates, allegedly. Your Honor, if I may be given three minutes for rebuttal, just to remind me. Oh, yes, exactly. I have a question before you sit down, and that is that the immigration judge said, even if we believed everything that he said, this persecution was not on account of any of the reasons covered by the Refugee Act. It's an argument over how to handle gambling proceeds and stuff like that. It's not. Do you have a comment on that? I realize that, Your Honor. Thank you for the question, Your Honor. He voiced out his backing of the money from the mayor. I mean, the mayor signifies the political structure of a town, and he was voicing out his belief that such should not happen, that the money should be given back to the people. I mean, this is a political statement on the part of Mr. Evangelista that that's the money that's supposed to be given to the people. And because of his belief and opinion that that should be the case, he was tortured by the mayor. And secondly, the NPA also came into this picture. He said, I don't want your protection. I'm against communism. And because of this, and there was a statement also, Your Honor, that they were asking money from him, and he refused that because he was against communism. And because of this statement that he had made and his belief that he was being tortured by the NPA and by the mayor. And I believe this belief of his is political in nature. I mean, I am against communism. It's political. I am against corruption. It's political in nature. I mean, being against corruption is political. So because of my belief that I am against communism, this signifies that this is my political belief and I am against. But I think in order to accept the I'm against corruption argument as being a political statement, which in certain circumstances, obviously it is, we have to say that this is a person who is quite willing to engage in illegal gambling operations. And the sort of corruption he dislikes is that when his gambling partner takes money for his own purposes instead of sending it on to where he thought he was supposed to send it. That's the kind of corruption we're dealing with. Your Honor, if I may clarify the situation, Your Honor. Mr. Evangelista was not what we call a voluntary partner. Oh, I see. In his view, he stated that very clearly. The mayor forced him into it because in his testimony, he had no choice because the mayor would kill people. Yes, Your Honor. I now understand. Yes, I recall that. So Your Honor, I mean, voicing out your opinion against corruption, against communism, I believe these are political statements, Your Honor, that landed him into this quagmire of being tortured by the police or the PNP, Philippine National Police in this case, and by the New York Times. I reserve my rebuttal, Your Honor. Okay. Thank you. May it please the Court, Blair O'Connor for the Attorney General in this matter, Your Honors. In this case, the immigration judge presented specific cogent reasons for her adverse credibility determination, and petitioners have failed to demonstrate that the evidence and record compels a contrary conclusion. Because the record presents numerous and significant inconsistencies between petitioners' testimony and their asylum application that went to the heart of their claim, the immigration judge's decision should be affirmed. Furthermore, even had petitioners presented credible testimony, their failure to link any such alleged persecution to a qualifying ground for asylum also defeats their claim. Now, the petitioner's claim was based upon an alleged illegal gambling operation that the mayor supposedly forced them into, and the subsequent public protests against the mayor's corruption at a rally attended by about 300 people. Therefore, Your Honors, the details surrounding this gambling operation were critical, and they did go to the heart of their claim. And as the immigration judge noted, there are several significant inconsistencies in those details. For example, in his asylum application, petitioners stated that he was first approached by the mayor to participate in this illegal gambling operation in August of 1989. On his testimony and direct examination from his attorney, he testified that the mayor first approached him to participate in the gambling operation on May 29th, 1991, almost two years later than the date that he gave in his asylum application. Now, when he was confronted with this inconsistency, he tried to explain it by saying, well, it was 1989. The 1991 date was just the first time the mayor was mad at me because I was going to expose him. But he was very clear on the asylum that he was first approached in 1989. No, that's absolutely right. His testimony does say. On the other hand, why isn't that just a mistake? Meaning, does the change in date in any way enhance his application? I understand lying that enhances the application. But this may be, if it's lying, it doesn't make any difference what the dates actually were. Well, again, Your Honor, it's significant because the persecution stems from the gambling operation. I understand that. But the fact that it happens in 1991, it begins in 1989, it happens – when it happened, it doesn't matter. It's the same thing. So this is not a lie that helps the story one way or the other. I mean, it may be a lie, it may not be a lie, but it doesn't help the story, what the dates are or are not. Do you follow me? I follow you, Your Honor. I mean, again, the government would submit that it is a factor that can go into the determination regarding adverse credibility. And again, we'd also note that after, in his cross-examination, he does say, no, it was 89. Two pages later, he says that the mayor wasn't even elected until 1990 or 1991, which again is inconsistent because if the mayor wasn't elected to 1990, how can the mayor be coming to him in 1989 in his capacity as mayor? There are also other inconsistencies regarding on when the alleged acts of abuse occurred. On direct examination, he testified that he was first beaten by the police in his home for organizing the rally where he exposed the mayor in August of 1991, and the second beating took place in December of 1991. On cross-examination, he switched and said these two beatings occurred in May and June of 1991, three months and six months earlier than what he had testified to under direct examination. On direct examination, he said that he was first contacted by the NPA members in September of 1991. On cross-examination, he says, no, I was not first contacted by them until December of 1991. When he's confronted with the inconsistency, his explanation, which we say is not a reasonable one, well, no, the first time I seriously talked to them was December of 91. But the first time, yes, they did contact me was, as I said, in September of 91. Furthermore, there is a significant inconsistency with respect to how he was contacted by the NPA on the first occasion. In his asylum application, he says that they visited him directly in his home and told him that, look, we've heard that you're having problems with the mayor. We'd like to offer you protection against the mayor. On direct examination, his story changed. He said that the first contact took place through a human rights leader by the NPA, and that the NPA did not contact him directly. Rather, they relayed the information and the offer of protection through this human rights leader. When he was confronted about this inconsistency on cross-examination, he goes back to his first story and says, no, I was wrong. The NPA visited me directly in my home. Furthermore, as the immigration judge properly pointed out, there were several significant facts that were contained in his asylum application that Petitioner never even testified to on direct examination. For example, he said in his asylum application that he received a letter from the police in his town threatening both he and his wife that they were going to kidnap their children if he did not continue to finance the gambling operation. Never testifies to this in his direct examination. His asylum application also indicates that he received an alleged telephone call from the mayor warning him to be careful with his dealings with the human rights leaders and the NPA, and that accusing him of being associated with the NPA, that the police knew about this and that he could arrest him and his wife at any time. Again, he does not testify about this at all in his testimony before the immigration judge. Perhaps most significantly, in his asylum application, he indicates near the end that on one occasion, towards the end of his time in the Philippines, his house was the victim of a drive-by shooting where armed men shot several bullets at the house, and that this prompted both him and his wife to relocate their children to relatives in Manila. Now, obviously, this is a very significant event, someone's own home being, you know, shot up in a drive-by shooting. No mention of it whatsoever on his testimony before the immigration judge. The only thing that I want to just nudge at a little bit is, ordinarily, I'm accustomed to seeing the written application not being strong enough, and the story gets better. Here, the story got worse, or rather, it got worse, et cetera, but there's all these telling details. All of a sudden, they aren't there anymore in the testimony. Does that mean I should disbelieve the testimony because he left out all these details that actually are quite favorable to him? Well, Your Honor, I would submit that because some of these events are very strong, his failure to even mention them questioned whether or not they actually occurred. I mean, in the asylum application, he's not under the constraints of an attorney's questions. He can put down whatever he wants to make the strongest claim possible, but when he's presenting his testimony before the immigration judge, it's imperative that he mention the most significant aspects to establish his claim, and he neglects to do so, not causing the question whether or not those events even occurred. One of the final things I'd like to point out is that he also, there was a failure to corroborate here. In his asylum application, he indicated that he was mentioned in a newspaper article as being one of the gambling lords that the police were looking for, and when he was asked on cross-examination, why didn't you introduce this newspaper article, his reply was that it was lost in the flood, in the tidal wave that occurred in August of 1991. And he also claimed to have gotten letters from both Mr. Sandoval, the human rights leader, and from the vice mayor who came and visited him and told him, look, you need to get out of town because the mayor is after you, that he had had letters from these individuals that were also lost in the flood that occurred in August of 1991. Now, the problem and why this is significant, Your Honors, is that most of the events that happened to him happened after August of 1991, including the visit from the vice mayor. He didn't visit the Evangistas until 1992. Therefore, how could he have written a letter to support their application saying, yeah, I came and visited them and I told them they need to get out of town? How can you write a letter about that before it even occurs? It just doesn't correlate there, Your Honor. The last point I'd like to make is that, again, as Judge Camby's question to Fisher's counsel, even if they had testified credibly, there still is a lack of a nexus between the alleged acts of persecution being on account of any qualifying ground for asylum. By Mr. Evangista's own admissions on direct examination or on cross-examination, the reasons he said the mayor and the police were harassing him was because he had publicly exposed the mayor at this rally attended by about 300 people, and that the mayor was Therefore, any acts from the mayor and the police were in retaliation were personal. It was a personal retaliation because they had exposed him. It wasn't on account of any political opinion they had or anything like that. Furthermore, with respect to the members of the NPA, they were after them allegedly because the petitioners had given the police information about three of their members who were later killed by the police, and that's why they allegedly beat them and persecuted them. Again, that's in retaliation for acts that the petitioners allegedly did. It's not on account of any political opinion or things of that nature. So barring any other questions, Your Honors, to sum up, the evidence in this record fails to compel the conclusion that petitioners presented credible testimony of persecution by the town mayor, the police, or the NPA. If anything, the record compels the conclusion that they were not credible. Furthermore, even assuming credibility, they failed to tie the persecution to a qualifying ground for asylum. Therefore, we request that this petition for review be denied. Thank you. Thank you. With the Court's permission, thank you, Your Honor. This Court had the opportunity to discuss credibility in the case of Manimba v. Ashcroft, wherein the Court says the credibility finding must be supported by the specific cognate reasons that are substantial and bear a legitimate nexus to the determination that the petitioner did not meet his burden. We have here allegedly inconsistencies about the dates, about dates when the mayor first contacted them. I mean, the respondent or the petitioner in this case already stated that the first contact was in 1989, but it has a falling out in 1991, when the mayor himself went to respondent and told him not, and threatened him not to expose the alleged corruption that the mayor was doing. The second inconsistency that was said and mentioned was the date when the NPA allegedly first had first contact with him, which is either in September 1991 or December of 1991. But the respondent or the petitioner in this case clearly stated that his first serious contact was in December of 1991. He may have contact with them in September of 1991, or Mr. Sandoval, who is the human rights, may have contact. We don't know. But, Your Honor, these inconsistencies do not go to the very merits of this case. The fact is that he fears going back because of two things, the mayor and the NPA. I'm afraid of them. I'm afraid of the mayor because of the things that he is doing and the corruption that he's doing that I've exposed and I'm against with, and the NPA, that I am against with, and the protection. There is alleged inconsistency, again, or omission that were done during the testimony of the mayor's alleged threat to kidnap the children, the mayor's call, the NPA torture, and the armed men spraying bullets. When asked why did he omit these things, he specifically stated that nobody asked those questions. I mean, if this were the thing, I mean, I know it would have been the failure of the counsel just to initiate or to ask a specific question about this incident. The counsel, if I could say insufficient representation of counsel, I would do that. I mean, if I am on the testimony and nobody asked me how could I produce this testimony, I cannot just say, oh, this thing happened, this thing happened, I cannot voluntarily give this statement. In a trial setting, this, the counsel should elicit those facts from the witness and not the witness voluntarily giving this facts. I mean, if nobody asked this question, how could I give this question? If nobody asked this question, how could I give this facts? I would say it's because, probably because of the counsel's lack of interest or lack of giving this or exposing this facts during the trial itself. Now, Your Honor, I submit that we have here a person torn between two powerful forces in the Philippines, and I'm asking you to please grant the political asylum. I mean, he would be tortured or has been tortured by the mayor and by the NPA. Your Honor, if, with your grace, please grant the political asylum of this person here. Thank you. Thank you very much. Thank both of you for your arguments. The case of Evangelista v. Ashcroft is now submitted for decision. The next case on the calendar, Portofino Development Group debtor, Decker v. Mariana, has been submitted on the briefs.
judges: Canby, W. Fletcher, Tallman